Anderson, J.,
delivered the opinion of the court.
This is an action of trespass on the case, by the plaintiff” in error against the defendants, common carriers, to recover damages for the loss of a trunk and its contents, valued at f 515. There was a demurrer to the declaration, which we think was properly overruled ; and a plea of not guilty. And upon the issue there was a verdict and judgment for the defendants.
Upon the trial, the plaintiff took several exceptions to *660 the rulings of the court. The questions which we will consider, are raised by the third and fourth bills of excepti°n- The third exception is to' the instruction given by the court to the jury, which is in these words : “ K the jury believe from the evidence, that the contract offered in evidence by the plaintiff, was in fact made with the Virginia Central Railway Company, then the plaintiff’ is not entitled to recover in this action.”
The record does not show 'upon what ground this instruction was given. The suit was brought against the Chesapeake and Ohio Railroad Company; but it by no means follows, that proof that the contract was made with the Virginia Central Railway Company should necessarily defeat the plaintiff’s recovery. If the name of the Virginia Central Railway Company, with whom the. contract was made, or to whom the trunk was delivered, as a common carrier, was afterwards changed to-that of the Chesapeake and Ohio Railroad Company, suit could be brought against the company by the latter name, and by no other. If the instruction had been qualified by adding, “unless the jury believe from the evidence that the name of the Virginia Central Railway Company had been afterwards changed to that of the Chesapeake and Ohio Railroad Company,” the objection to the instruction would have been removed. But as given, however clear and satisfactory to the jury the evidence might have been to show that the company sued was the same company by whom the grievance complained of had been committed, though under a differ 7 ent name, the jury might not have felt warranted in finding a verdict for the plaintiff. The court by this instruction, undertook to decide, either- upon the evidence, that the Chesapeake and Ohio Company was not the same company that was known by the name of the Virginia Central Railway Company, or upon the law, that when a contract was made with a corporation having a certain name, it must be sued in that name, although its name *661 was afterwards changed; and upon either ground we think the instruction was erroneous. It is well settled, that if a corporation changes its name after contract made, it must he sued in its new name. If the instruction was given upon the other ground, it would seem tó be an invasion of the province of the jury to decide upon the evidence before them, whether the Chesapeake and Ohio Railroad Company was a continuation of the Virginia Central Railway Company under a new name, which seems not to have been a pure question of law, but a mixed question of law and fact. But was the court right in its construction of the law ?
On the 26th of February 1866, an act was passed by the General Assembly of Virginia, entitled, “An act to incorporate the Covington and Ohio Railroad Company.” Sess. Acts of 1865-’6, chap. 200, p. 317. By the first section fit is enacted, “that the persons upon whom the benefits of this charter may hereafter be conferred, and who • may be organized as hereinafter provided, shall thereupon be constituted a corporation, under the name and style of the Covington and Ohio Railroad Company,” &c. The second section provides, that “ the said Covington and Ohio Railroad Company when fully constituted and certified, as hereinafter provided, shall have all the rights, interests and privileges, of whatsoever kind, in and to the Covington and Ohio Railroad, and appurtenances thereto belonging, now the property of the State of Virginia,” upon the condition and limitation therein expressed. By the 9 th section, commissioners are appointed, who are authorized to act in conjunction with a like number of commissioners on behalf of West Virginia, should they be appointed, “whose duty it shall be, to offer the benefits of this charter for the acceptance of capitalists, so as to secure the speediest and best construction, equipment and operation of said railroad.” To this end the commissioners were authorized to contract with any parties who shall *662 give the best terms, and most satisfactory assurances of capacity, and responsibility for the undertaking, &c. This act was not carried into effect. And at the next session, March the 1st, 1867, the Legislature passed “an t° provide for the completion of a line or lines of railroad, from the waters of the Chesapeake to the Ohio.” Sess. Acts of 1866-7, chap. 280, p. 705.
This act provides, or proposes, several plans or methods for the accomplishment of this purpose. One is contingent upon the organization of the Covington and Ohio Bailroad Company, under the charter granted by .the act of February 26th, 1866. And when that was done, to authorize it to consolidate with various other railroad companies, or one or more of them : in which event the consolidated company is to be known as the Chesapeake and Ohio Bailroad Company, and invested “ with all the rights, privileges, franchises and property, which may have been invested in either company prior to the act of consolidation.” It also provides that if the Chesapeake and Ohio Bailroad Company should refuse to consolidate with the Norfolk and Petersburg and Southside Bailroad companies upon application, that those companies may consolidate, and be known as the Norfolk, Petersburg and Covington Bailroad Company, and have the privilege of extending their road to Covington, &c. And it makes various provisions affecting the rights and privileges of that company, and in relation to its organization. These provisions of the act were not carried into effect. But the plan proposed by the 15th section was.
That section provides, “that the Virginia Central Bailroad Company may contract with the Covington and Ohio railroad commissioners for the construction of the railroad from Covington to”the Ohio river ; and in the event such contract be made, the said Virginia Central Bailroad Company shall be known as the Chesapeake and Ohio Bailroad Company, and shall be entitled to all *663 the benefits of the charter of the Covington and Ohio Railroad, and to all the rights, interests and privileges, which by this act are conferred upon the Chesapeake and Ohio Railroad Company, when organized.” And the record shows that, on the 31st of August 1868, the Covington and Ohio railroad commissioners, on behalf of the State of Virginia and West Virginia, entered into a contract with the Virginia Central Railroad Company, by which that company undertook to construct the railroad from Covington to the Ohio river, and thereby, and by virtue of the said 15th section, took the name of the Chesapeake and Ohio Railroad Company, and became entitled to all the benefits of the charter of the Covington and Ohio railroad, and to all the rights, interests and privileges, of the Chesapeake and Ohio Railroad Company. We are of opinion, therefore, that the Chesapeake and Ohio Railroad Company is a continuation of the Virginia Central Railroad Company, with additional franchises, under a new corporate name; and consequently, that in every point of view the third instruction was erroneous..
The fourth instruction is, “If the jury believe from the evidence, that the contract with the railway company was to carry the plaintiff as a passenger with her baggage, then the plaintiff is not entitled to recover under the pleadings in this action.” As has already been said, the plaintiff in this action, has not declared upon a contract, but upon the common law obligation of the public carrier. It was only necessary to allege the delivery of the goods to the carrier, to be carried by them from Richmond to the White Sulphur Springs, and that the same were received and accepted by the carrier, to show the common law obligation. The common law upon the facts alleged, imposes the duty, for the breach of which the carrier is liable to the shipper.
These facts are sufficiently set out; and they are sufficient to fix the liability of the carrier, if the proof cor *664 responds. But the allegata and the probata must agree. The proof is that the trunk with its contents, was delivered to, and accepted by the carrier, to.be carried to the White Sulphur Springs. But it shows in addition, that. ^e plaintiff went herself as a passenger, and paid for a through ticket to the White Sulphur Springs ; and that this trunk contained her wearing apparel, and was taken as a part of her baggage.
We are of opinion that the obligation of the public carrier to carry safely and deliver the trunk at the White Sulphur Springs was the same, whether the plaintiff was a passenger or not. It is an elementary principle of law that the carriers of passengers are liable for their ordinary baggage as common carriers. 2 Bedf. on .Carriers, p. 37, § 155. So that it was not material, in order to fix the liability upon the carrier, to allege that the plaintiff went as a passenger and that the trunk was taken as part of her baggage. There is no disagreement between the proof and the allegation. And we are of opinion, therefore, that this instruction was erroneous, and ought not to have been given to the jury.
But although these several instructions were upon points vital to the plaintiff’s action, yet if upon the whole case it is evident that, upon other grounds, the plaintiff could not maintain her action, the judgment ought not to be-reversed. And such is the case, if it be true, as contended by defendant’s counsel, that the continuity of the bailment was broken by the plaintiff removing her trunks from the custody of the company at Covington, and taking charge of them herself. Or if the other proposition be true, that the railroad company was only liable for losses sustained on their part of the line. These are interesting questions, and deserve a careful consideration.
In relation to the first position, the proof is, that through passengers to the White Sulphur Springs were allowed to remain all night at Covington, at pleasure, *665 without forfeiting their passage, and were not obliged to stop at any particular hotel. If the through passenger, was allowed to remain all night in Covington, at his option, without forfeiting his passage as incident to it, he was entitled to retain his baggage. And it being sent, to his lodgings did not break the continuity of the bailment so as to release the carrier from his original undertaking to deliver it safely at the White Sulphur Springs, if the same was returned to the agent in proper time the next day, to be conveyed with the passenger to the place of its destination. If there had been a loss of the trunk, or any of its contents, while out of the agent’s possession, and while in charge of the owner, or the hotel keeper, it is true the carrier would not be responsible. But that is not pretended. And the passenger, having the privilege of lying over for a night at Covington, without impairing the obligation of the carrier to carry him through the next day, he had an implied right to retain his baggage, and the obligation of the carriers, to carry it through the next day when delivered to them, was the same it was to carry the passenger. If the obligation had been to carry by rail to the White Sulphur Springs, and the passenger had the privilege to stop for a night by the way, and to take a train the next day,' it is very clear that the responsibility of delivering the passenger and her baggage at the White Sulphur Springs would not be relieved by the passenger availing herself of the privilege of stopping for a night by the way. And the transportation being by rail to Covington, and thence by stage to the White 'Sulphur Springs, could, make no difference as to the obligation of the company, if it was their undertaking to deliver the passenger and her baggage safely at the White Sulphur Springs. Was that their undertaking we will now proceed to enquire.
“It is quite clear, (says Mr. Justice Story), that a carrier may contract to transport beyond his own line, and may make connecting lines his agents, and thus *666 become responsible to the owner of merchandise for its loss, at any period, or at any place, while it is in trans^-” Story on Bailment, § 588, and cases cited, English and American. And Mr. Redfield says : “It has generally been considered, both in this country and in the English courts, that receiving goods destined beyond the terminus of the particular railway, and accepting the carriage through, and giving a ticket or check through, does import an undertaking to carry through; and that this contract is binding upon the company. Whether such contract exists, is regarded as a matter to be determined from all the facts and attending circumstances of the case, and will more generally be an inference for the jury than the court. 2 Redf. on Railw. p. 109, 110, and cases cited. How let us apply these principles.
At the time of the alleged grievances, the Virginia Central railway was an unfinished road. Its cars were running west only as far as Covington, some twenty-five miles short of the White Sulphur. But by an act passed the 19th of April 1867, they were authorized to lay down the superstructure, and to do all other work necessary for bringing into use the Covington and Ohio road between Covington and the Alleghany tunnel, near the White Sulphur Springs. And were to .have possession and use of the same, and of all the works connected therewith, until required to surrender, if found desirable, to effect a contract for building the part of the road lying in West Virginia. And in that ease their cost, in bringing the section of the road aforesaid into operation, was to be refunded. But as we have seen, by the contract of August 81st, 1868, some fifteen days after the plaintiff purchased from them a through ticket, from Richmond to the White Sulphur Springs, they acquired the right to the whole line of railroad from Covington, passing by the White Sulphur Springs, to the Ohio. It was undoubtedly of great importance to this company to provide temporarily the means of transportation from *667 'Covington to the White Sulphur Springs, the great point of attraction, until this unfinished part of their road was put in running order, and to furnish the best accommodations and facilities for reaching the other mineral springs, from different stations on their road, so as to invite and secure this important travel.
Accordingly we find that they entered into a written contract with James A. Trotter & Bro., stage proprietors, by which they held them bound, at all times to furnish a sufficient number of substantial and suitable coaches to accommodate all the travel which might be brought by the railway to the western terminus of their road, as well as to the other stations on the road named in the contract. They bound them to carry their passengers’ baggage, free of charge within a prescribed limit, and for extra baggage limited them as to their charges. They limited them as to the number of passengers to be carried on each coach, and reserved to themselves the privilege of dissolving the contract,. in effect, at pleasure, and of employing other agencies for this service. It was the evident intention of the parties, that all the railroad travel to the places designated, should be transpoi-ted by the Trotter line of stages; and if necessary to prevent and put down competition, the railway company was to defray two-thirds of the expense incurred. And the stage company was to have an agreed proportion of the receipts on all through travel. And with regard to casualties, losses, &c., it was stipulated as follows : “ It is distinctly understood and agreed between the respective parties to this contract, that each shall be solely and separately responsible for all casualties (losses, &c.) which may occur on their respective portions oí the aforesaid lines of travel, and if either of the parties should be held responsible for any loss, damage' or injury occurring on any part of the aforesaid lines of travel, owned by the other, such responsibility shall be discharged by the party on whose lines the loss, *668 damage or injury occurred.” And it is further provided, that a bond for $20,000 dollars, with approved security, shall be given by James A. Trotter & Bro. to the Virginia Central Railroad Company, conditioned for the faithful performance of their agreement.
The railway company having thus provided for the transportation of passengers, with their baggage, from the terminus of their road to the-White Sulphur Springs^ on the 15th of August 1868, sold the plaintiff a through ticket from Richmond to. the White Sulphur Sprngs received pay from her for the through route; and gave checks for her baggage, indicating that it was to be carried through to the White Sulphur Springs. The plaintiff’s trunks were carried safely as far as Covington, and were then put in charge of the stage agent, who received from the plaintiff her checks for them, before she left the railroad car. One of the trunks containing the-plaintiff’s wearing apparel, was never delivered to her at the White Sulphur Springs, and is lost to her. We think the undertaking was, by the railway company, to deliver safely the plaintiff and her baggage, at the White Sulphur Springs. The ticket issued to the plaintiff has counterparts on the same card, one headed “Trotter Stage Line,” and just below, “Issued by Virginia Central Railroad.” On the other part is headed, “Virginia Central railroad,” and just below that, as below the heading on the other part, is, “ Issued by Virginia Central Railroad.” Both parts are signed by “ J. F. RTetherland, Gen’l Ticket Agent,” who is proved to be the ticket agent of the railroad. Upon the margin of each part is printed, “Richmond to White Sulphur Springs.” What does that import? It can import nothing else, than that the holder is entitled to transportation from Richmond to the White Sulphur Springs. By whom ? By Trotter & Bro. ? Both parts import an entire undertaking from Richmond to the White Sulphur. That could hardly have been undertaken by Trotter & *669 Bro. But in truth, they undertake nothing. The ticket in neither of its parts is issued by them. Both parts profess to be issued by the railway company. It is not signed by Trotter & Bro., or their agents. But both parts are signed by the railway general ticket agent. There is nothing upon the ticket, which creates any obligation on the part of Trotter & Bro,, to the holder. The words “ Trotter Stage Line,” at the top of the ticket, can only mean, that that agency is employed by the railway company, to fulfil their obligation to convey the passenger and her baggage on the stage part of the line, to the White Sulphur Springs.
The ticket, therefore, imports no contract between the plaintiff and Trotter & Bro. There is nothing upon it to bind them,. But it evidences an undertaking on the part of the railway company alone, to convey the plaintiff with her baggage, to the White Sulphur Springs. And this conclusion is supported and confirmed by the checks which were given by the railway company, clearly indicating an undertaking to deliver the baggage at the White Sulphur Springs. It was argued by counsel, that checks cannot be relied on as evidence, for such a purpose. But we think that upon reason and authority both, they are evidence of the company’s undertaking. In Dill v. Railway Co., it was held that the check stands in the place of a bill of lading. 7 Rich. R., 158; 2 Redf. on Railway.
The stipulation in the contract of the railway com-' pany with the stage company, that each party should be liable for losses upon their respective lines, does not militate against the conclusions to be drawn from the foregoing evidence. ' It was a contract between themselves, and not binding upon the plaintiff, who was no party to it. And the railway company required of the stage company ample security against loss, if they were held responsible for losses occurring on the stage part of the line. When we consider what was substantially, *670 and in effect, the contract between these parties, we can regar(l it as constituting Trotter & Ero., if not partners> agents of the railway company in this business; and thus viewed, it is strongly confirmatory of the infererices deducihle from the other facts already commented on. We are- of opinion, therefore, that the railway company, undertook, undoubtedly, to carry the plaintiff and her baggage to the White Sulphur Springs ; and that they are responsible for the loss of it on any part of the route, unless relieved from the responsibility by the notice printed on the ticket.
I If it was the undertaking of the railway company, as has been shown, to carry safely the plaintiff and her baggage to the White Sulphur Springs, does not the law. attach responsibility for the failure to deliver the baggage at that place ? The undertaking of a common-carrier to transport the goods to a particular destination, necessarily includes the duty of delivering them in safety; and his obligation is to deliver safely at all events, except the goods be lost by the act of God, or the public enemy. Angell on Carriers, p. 287, § 282. Carriers of passengers are not held responsible to the same extent with common carriers, except in regard-to the baggage. 2 Greenl. on Evid. p. 194, § 221. The carrier is only answerable for an injury to the passenger, where there has been some want of care or skill, but he must answer for the loss of the goods, though it happened without his fault. Ib. note 5. Is not the attempt, then, of the railway company to shift the responsibility from their shoulders, and to lay it upon the stage company, repugnant to the obligation they assumed. Suppose the railway company had put a line of stages of their own between Covington and the White Sulphur Springs to-convey their passengers with their baggage from the terminus of the railroad to the White Sulphur, and caused a notice to be printed on the ticket to this effect r “Responsible for safety of person and baggage only *671 upon the railroad part of the linesuch a notice, although brought home to the passenger, would be invalid unless he assented to it. And even if an express contract were proved, to release the carrier from responsibility on the stage part of the line, he would still be liable for negligence, such as is proved in this case regard to the stage agent. For the trunk was lost by his gross negligence in not having it removed from the Sweet Springs stage to the White Sulphur stage, after his attention had been specially called to it by the plaintiff. But if such a notice .would be unavailing to relieve the carriers from responsibility if their own stages were put upon the line, is that responsibility any the less because they have employed the agency of Trotter & Bro., with their coaches, to carry through the railway company’s passengers and their baggage ? Qui faeit per alium, faeit per se. Bed-field goes farther. He says, “in the case of a common carrier of goods, he is liable for the act of all the servants of his sub-contractor.” 2 Bedf. on Bailw. p. 116.
When the railway company undertook to carry passengers and their baggage through to the White Sulphur Springs, and received compensation for the whole route, can they limit their responsibility, and say to the passenger, although we have undertaken to carry you and your baggage safely to the White Sulphur Springs, yet if we fail in it, and your baggage is lost on the stage part of the line, you must look to our agent for redress, and not to us. Although we are bound to deliver you and your baggage safely at the White Sulphur Springs, if we fail to fulfil our obligation, and your baggage is lost on the stage part of the line, we will not be bound to make it good; but you must look to our agent. It would seem that such a qualification and limitation of their responsibility would be repugnant to, and incompatible with, their express obligation.
Although the railway company have a contract with *672 Trotter & Bro., by which the latter are bound to the former to be responsible for, and to pay for all losses occurring upon the stage part of the line, the passenger has no such contract with them. And is it competent for the railway company to release themselves from their responsibility resulting from their undertaking to carry the passenger through to the White Sulphur Springs, by a notice to the passsenger that they will not be responsible for any loss sustained on the stage part of the route. It might with as much propriety be said, that a stage proprietor, or any public carrier, would be relieved from responsibility by a notice to the passenger that he would not be responsible for baggage. But it seems to be well settled by American decisions, that a stage coach proprietor, or other carrier, cannot be relieved from his common law responsibility by a general notice that “ Baggage of passengers is at the risk of the owners.” AngelPs Law of Carriers, § 238, and seq. Suppose Trotter & Bro. had failed to furnish a stage coach at Covington to carry her through, and she had been detained there for want of a conveyance for several days, by which she had sustained heavy losses, who would have been responsible to her upon this contract ? Trotter & Bro. or the railway company ? Can the railway company, by a general notice, oblige the passenger to look to a party with whom she has no contract, and no connection of any sort, who is unknown to her, and who may be insolvent, for any non-compliance with the undertaking of the railway company, or for a loss of her baggage, which they had undertaken to convey to the White Sulphur Springs? We think not. Such a notice is repugnant to their express undertaking, from which they could not be released, except by the act of the party to whom the performance was due. The notice, therefore, being incompatible with the obligation of the •company, is void, unless assented to by the passenger.
But if this conclusion was not warranted by the cur *673 rent of English' and American decisions, and by elementary principles, as we believe it to be, it seems' to be well settled, that the notice, in order to be availing, must be actual. The knowledge of it must have been brought home to the plaintiff: and that is a question of fact for the jury. “ The mere advertisement by the carrier the terms and limitations of his responsibility, however public it may be, will have no effect, except upon those to whom knowledge of it is directly or constructively brought home.” It will not be sufficient that the notice is publicly posted up in the carrier’s office in writing or in print, unless the party who is to be’effected by it is proved to have read it. The case of Mary Brown v. The Eastern Railroad Company, 11 Cush. R., 97, which was decided by the -Supreme Court of Massachusetts, was very much like this case. The delivery of two trunks in that case, and the non-delivery of one'of them at the place of destination, the one containing the wearing apparel of plaintiff, and a demand therefor and its value, were fully proved. The plaintiff wished to- go from Boston to Ereeport, in Maine. Her trunks were delivered to the baggage master of the railroad company and checks demanded. He said he w-as out'of checks, but marked the trunks “Ereeport.” She inquired at the ticket office of the defendants in Boston, for a ticket to Freeport, and was -told that no tickets were sold to Ereeport, but that she could buy a ticket to Brunswick, (aplace beyond Ereeport,) and get out at Ereeport; and that one dollar would be refunded to her. She paid $3 for a ticket, which had printed on its face, “Hot transferable. This ticket entitles to a passage,” &c. And on its back the following words : “Hotice—Passengers are not allowed to take, nor will these companies be responsible for, baggage if it exceed fifty dollars in value, unless freight on any addition thereto be paid in advance ; and this notice forms part of all contracts for transportation of passengers and their effects.” *674 There was a break in the line of railroads, of about one m^e iQ Portland, and it was the practice of the defendants to transport over that break the baggage of passengers for Brunswick, but not for Freeport. There was evidence that the plaintiff’s baggage was carried over this break at all ; or that she had any notice or knowledge of this practice. Between Boston and Portland, the plaintiff called the attention of a companion to the words on the back of the ticket. On the trial in the court of Common Pleas, the judge ruled, that taking the ticket raised no legal presumption that the plaintiff" read the printed matter ; that it Was a question of fact whether she knew the contents before she started on her journey ; and that if she did not read it until she was on her way, her rights were not affected by it; and that if the contract was for a passage to Freeport, or to Brunswick with permission to get out at Freeport, the railroad was bound to transport her baggage across said break, unless notice wjas given that they should not do so. Upon an appeal to the Supreme court of the State, this ruling of the court of Common Pleas wras affirmed. The court says in the opinion : “A mere passenger ticket the form in general use, would not naturally induce to the reading of its contents. The party receiving it might well suppose that it was a mere check signifying that the party had paid his passage to the place indicated on his ticket.”
Usually the ticket office is opened but’ a short time before the train leaves. And the ticket has to be exhibited to the baggage master before he will check for the baggage. So that the passenger has scarcely any time to read the ticket before the train leaves. In general he only asks for a through ticket to the place of his destination, and relies upon the agent to give him the proper ticket. And if the passenger had time to look at it for an instant in this case, she would have seen that it was a ticket issued by the railway from Richmond to the White *675 Sulphur Springs. She would hand it to the porter, or a friend, to get cheeks for her baggage, while she would look out for a seat. It is returned with the checks, upon which are the letters W. S. S. She feels assured that all is right; and the next moment the train is moving. If she reads what ig on the ticket at all, it is because she has nothing else to do, or from mere curiosity. And she reads for the first time, “ Responsibility for safety of person or baggage, on each portion of the route, confined to the proprietors of that portion alone.” She would say to herself that was not my understanding when I asked for a through ticket, and when I paid for it to the railroad agent, and when they gave me a check for my baggage, which by the letters on it indicated, that they undertook to carry it through to the White Sulphur Springs. But the train has been bearing her away from Richmond with the speed of twenty miles an hour, and it is too late to turn back.
If the railway company could relieve themselves from the legal responsibilities of their undertaking by such a notice, they should bring home the notice to the passenger before he pays for his ticket; at all events, in time for him to have his baggage removed from the car befoi’e the train left. It would seem reasonable, if it were a question of the first -impression, to require the notice to be given before the money is paid. Mr. Justice Story says, “ it has been said, if coach proprietors wish honestly to limit their responsibility, they ought to announce their terms to every individual who applies at their office, and at the same time place in his hands a printed paper specifying the precise extent of their engagement.” Story on Contracts, § 761, p. 230. The question is usually asked of the ticket agent, Can I get a through ticket to such a place ? The answer is, Yes. What is the price ? The agent answers so much. The money is handed him, and theu he issues the ticket. He never lets the ticket go out of his hand until he gets the money : and that *676 completes the contract. It would seem that it is too late for him then to impose limitations and restrictions upon his implied or express undertaking, of which no intimation was given before the contract was closed.
At all events it seems to be well settled, that a carrier cannct be released from the legal responsibilities of his undertaking, unless the knowledge of the notice is brought home to the j>assenger in time to leave the car, and have his baggage removed before the train leaves. The mere delivery of the ticket to the passenger, with the notice printed upon its back, or on its face, under the usually attending circumstances which have been detailed, and which are of public notoriety, is not sufficient to raise the legal presumption of actual notice to the passenger before the train leaves. Such notices by printed cards, or inserted in newspapers, are not sufficient unless it be shown that knowledge of the conteuts of such notices came to the party; and this is always a question for the jury.” 2 Redf. on Railw. p. 83; Clayton v. Hunt, 3 Campb. R. 27; Rowley v. Horne, 3 Bing. R. 2. Whether the delivery of the ticket to the plaintiff, under the attending circumstances, brought to the knowledge of the plaintiff the notice printed on it before the train left, is a question of fact for the jury, and consequently it is not in the power of the court to say that upon this ground the plaintiff could not maintain her action. We deem it unnecessary to decide the questions raised by the other bills of exception, as they can hardly arise again. We think that the cause should go back to the Circuit court for a new trial to be had therein.
Judgment reversed.
Rote.—Before this opinion was delivered, and before the opinion of the court was known, the defendants in *677 error, by their counsel, asked leave to withdraw the point, which had been made in argument, that they were not liable for the acts of the Virginia Central Railroad, saying that they would prefer to lose the case than to have that point decided in their favor.